Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right. We're happy to hear argument in our first case, number 184524, United States v. Alston. Thank you, Your Honor. Please, the Court, my name is Lisa Driscoll and I'm appearing for Mr. Jurother Alston. In this case, it is regarding the suppression of a firearm that was found in an automobile during a stop. It is the defense's position that there are three separate reasons why the gun should have been suppressed in the suppression hearing. The first is that the nothing, just to briefly outline it, the first is that nothing in the court record indicates the gun would have been inevitably discovered, which is apparently as the district court ruled in the case. Why didn't you argue it in your brief? Well, it is argued to some degree in the brief. I just didn't use that term exactly. I said that the judge said that it would have been found because there was probable cause to. Right. And I didn't use the word inevitably. But it sort of didn't give us the argument, though, I didn't think. So maybe you can tell me where you think you've made the argument. Sure. In the brief. I thought that was the single most extraordinary thing because it seems to me that's probably your best argument. Well, and I would agree. But in the brief, when the it was the district court's ruling was that the that he suppressed the statements regarding where the firearm was found. And he suppressed the statement at the turning over of the bag after mom arrived. So there was the stop. There was a bag of marijuana that was tossed into the officer's car. There was the admission almost immediately that his license was revoked. OK, I'm really happy to hear all of your argument. And if you want to talk about the facts, that's fine, too. And I'm looking at page I and I'm looking at the table of contents. And maybe you can tell me where you talk about inevitable discovery. I did not use that term in this. Which of these arguments do you think raises the question of inevitable discovery? It would. And the way it was when I discussed the actual district court's statement and when he said that that there was probable cause to search the vehicle. But did you make an argument that there wasn't inevitable discovery? I did not use that term, Your Honor. Did you make an argument that there was something wrong with it, which was akin? Did you use a synonym for inevitable discovery? What I said was, is that the that but for the statement, the suppressed statement that the firearm was in the vehicle, that the officer then went to the seat. He went there. This press statement was that the firearm was under the seat. And then but for that statement, there would have never been a search of the car, that there never was a search of a car. And that is in the argument section. And I think I understand what you're saying. Go ahead. I'm sorry if it wasn't as clear as it should have been. But they couldn't have searched it based on the bag that they pulled that bag of marijuana out and threw it in the window. Well, that was what the district court ruled. And we would submit that that is not correct, that he could have had he chosen to do that. But he never chose to do that. He never searched the vehicle. He never looked in the vehicle. But you weren't saying that in your brief. That is an inevitable discovery argument. You're quite right. And neither you nor the government even brought this up. I just think this is a very weird situation. And that's why I will ask your colleague there, too. Well, and I'm happy to supplement this. No, no, no. But it was the way it was. And I agree with you that I did not say it, and I was not that clear. It was when I was mooting this that I became more clear that that was the statement that I should have used. And so, but it is outlined in the brief. And where it's outlined is where the district court says that they did have a reason to search the vehicle based on the initial throwing of the marijuana into the officer's car, that based on that he did have the reason. He said they would have inevitably found the firearm because there was probable cause to search under the Brogan's case. Yes, Your Honor. Authored by Judge Gregory. He even mentioned Judge Gregory. Yes. That's half of what you have to prove for inevitable discovery, right? Correct. So the other thing is that he would have done it. He could have done it. He had reason to do it. He had reason to discover this. But would he have done it? And where is your argument about that? Well, I do write in the brief that he never did do it. He never did search it. Do you understand the difference between could and would? Yes, Your Honor. Okay. So let's just say for purposes here you've made the argument that he could have done, that inevitable discovery would have permitted him to do it, could have done it. Where is the evidence that he would have done it, which is the other? You have to do two things to prove inevitable discovery. Yes, Your Honor. He never would have done it. That's argument. Well, then you haven't made out inevitable. But you don't give us any argument about that, do you? I don't articulate it and flesh it out as properly as I should have. Yes, Your Honor. I agree with that. All right. I'm sorry to interrupt you. Go about your argument the way you want to. In the inevitable discovery doctrine, it is that allows the government to use information obtained from an otherwise unreasonable search if it is established by preponderance of the evidence that the law enforcement would have ultimately or inevitably discovered the evidence by lawful means. And it is our position that Captain Aleem never would have discovered that firearm. He was never going to search that vehicle. But that argument is not in your brief. And I may be mistaken, but I believe that I do say that he never was going to search it and he never, in fact, did search it. Okay. Well, in your rebuttal, maybe you can address that. But you were starting out somewhere else. But what is the evidence that he would not have searched the car? He seemed intensely interested in finding the firearm one way or the other. So the fact that your client ultimately told him where the weapon was, it seems to me logical and reasonable to say that even if he had continued denying the existence of the weapon, the officer would have, in fact, searched that car because that's what he was interested in. Well, I would look at the timeline of how things happened to show that he was not going to search it. And that was that he knew about the marijuana, the revoked license, and called that in to dispatch at about 9 minutes and 47 seconds and ran the driver's license number. Then he tells Mr. Alston that, you know, if you call your mom and apply, you'll be able to leave, and that I'm not going to arrest you. But before all that, he had been reaching down to the bottom, reaching to the right in his car, fumbling under the seat so much that he ran into a parked car. Yes, sir. Yes, he did. Right. He was trying to hide that firearm. Well, he, but when he's pulled, he says, when he talks to the officer, he says, I was reaching for my phone. The officer then says, well, it was in the wrong hand during testimony. When he said that, he was lying because the phone was in his hand. Well, that's what the officer testified to, yes. I would suggest that he was not satisfied with that explanation and ultimately would have searched that vehicle. Isn't your best argument that the officer wouldn't have done it, is that the officer kept saying to him, I don't want to arrest you. I don't want to take you to jail. I want you to just, you're going to be free to go, and didn't search the car until the very end and other officers came in. And we would submit that he only reached under the seat and pulled it out. I agree with you. But he only reached in the seat, pulled it out. He never looked anywhere else in the car. He never seized the car. He never looked anywhere else in the car. When the district court cited the Brookins case, the Brookins case talks about there was probable cause to search that car. The officers used the probable cause to search it. We should say there's probable cause here, which I think there was. That argument doesn't go anywhere. What my colleague asked you is where is the evidence? I think that there is evidence in this record that the government could have exercised the ability to search the car and find this with inevitable discovery. And what my colleague said to you is where is the evidence that the government wouldn't have done that? And we, because obviously the officer did want to get the gun, and it seems to me the only real argument you have with respect to that is that the officer kept telling him, I'm not going to arrest you. You're free to go, and kept asking for him to voluntarily come up with this. Well, and it was, I think, 19 minutes later after the stop before he does it, before he actually gets the firearm. It was long after he had that. That sort of brings me under the Rodriguez versus United States argument, that he has to do this with an expeditious time. He doesn't have all the time in the world. Well, a lot of the time was spent waiting for his mom to get there. He asked if his mother could come, and the officer accommodated. And they waited five minutes at least for his mother to show up. So you're talking about the delay. He asked for the delay. He gave up the first bag of marijuana. As soon as he did that, there's reason to detain him. Yes, there was. And then the officer said, I'm not going to arrest you. I'm going to let you go. Yeah, but you're all addressing this about the Rodriguez argument. There's no excessive prolonging. He has cause to keep him there and arrest him. But in that argument that I was making, it's that, yes, he did. But he decided not to. Well, that doesn't make it a Rodriguez case just because the officer decided not to. Well, at that point, it would be our argument that he has dispelled what he wishes to do, whether he wishes to cite him, not cite him, arrest him. He tells Mr. Alston, I'm not going to arrest you. You may call someone and implies once you call someone and they come, you'll be free to leave. At that point. The officer was trying to help him or trying to accommodate him. He didn't know at that time that he was a convicted felon, did he? I don't believe he knew throughout the entire stop that he was a convicted felon. It wasn't until the other officers arrived. The governor argues there was no stop. Although Ted Tilley says there was. They say he stopped himself because he ran into a parked car. He did run into a parked car. There was no damage to either car. It was at a very low slope. He did stop himself and he was compliant and polite throughout the interaction with the police officer. And the officer was nice to him. He was outwardly accommodating to him. The officer was. That he was never going to arrest him. That he was never going to cite him. That he was going to let him go. And that he, the district court, had ruled in its finding of facts that he, the officer was being, Captain Lehm was being honest throughout the entire duration he was with Mr. Alston. And that he was never intending to arrest him for it. And that it would be reasonable for anyone to be in Mr. Alston's position to assume that he represented law enforcement. And that he was in fact not going to be arrested that day. And I believe that that was the reason for the suppression of the statements. I also had an additional argument that he was seized from the moment of the beginning of the stop. And that was based upon the totality of the circumstances of how the stop was accommodated. The district court in its final ruling decided that this was just an average traffic stop. But initially the district court had looked at it and said that this was not an average traffic stop. And that Captain Lehm had made a show of force at the very beginning to shatter the psychological advantage of the defendant. That he had a show of force in such that and did the stop in such as to make Mr. Alston compliant with whatever the officer wanted. Which was not akin to what a typical traffic stop was. And so I had the additional arguments that from the start he was under arrest. And any statements he made would be, you know, ought to have been suppressed. So when did that arrest occur? You said he was initially, he was arrested initially, right? That would be our argument, yes. At what point did that occur? I'm out of time if I may answer. Yes. That it would be the way the officer pulled up. He did not pull up in a typical manner. When he pulled up beside him. When he pulled up beside him and he couldn't open his door. And he couldn't open his door and he was yelling at him. That would be our. Thank you. Thank you. So as I remember the record here, the government told the two parties to come back and talk to him about inevitable discovery. Is that how you read the record? First, good morning, Your Honor. Good morning. My name is Terry Monique. I represent the government in this matter. Judge Tilley did ask the parties to come back. I don't remember that he specifically asked us to address inevitable discovery. Nobody did, for sure. I wasn't disputing that he did. I just remember that he invited us to brief additional issues. And what additional issue do you think he invited you to brief? I do remember having a discussion about inevitable discovery. But it seems to me that at the subsequent hearing that was conducted, we discussed more than just inevitable discovery. But that wasn't exactly my question. What additional issue do you think that he asked you all to discuss? I don't remember any specific additional issue that he asked us to discuss, Your Honor. So were you the lawyers here? Yes, ma'am. And you haven't looked at the joint appendix? I have, Your Honor. Okay. I have. This court should affirm the decision of the district court below because Judge Tilley was absolutely correct that there was not custody. The defendant simply wasn't in custody at the time, especially at the initial stages. He couldn't get out of his car. That's true, Your Honor. And the best way to analyze that, I think, is to compare what happened with respect to the traffic stop here to what we would call an average traffic stop. An average traffic stop. An average. A routine traffic stop. In your average routine traffic stop, a law enforcement officer typically— I thought you all argued that it wasn't a stop because he ran into the park car and I stopped himself. That's correct, Your Honor. But Judge Tilley says it was a traffic stop. Judge Tilley did make that finding. So which side is the government on, Judge Tilley's side or its own side? Well, Judge Tilley ultimately made the right determination with respect to the defendant's motion to suppress. I understand that, but you all take a different position on whether there was a traffic stop than Judge Tilley does. That is correct on that. So you're saying he's clearly erroneous when he said there was—when he found there was a traffic stop. No, Your Honor. I did not argue that he was clearly erroneous. Well, it has to be if you argue—otherwise you have to accept his finding. Simply pointing out that based upon the case law that's available to us here, the defendant was so preoccupied with looking over his shoulder at Captain Alleyne and reaching into the passenger compartment of the vehicle of his car that he wasn't paying attention and he ran into the vehicle in front of him. So you say that was not a traffic stop then? Because he never— But Judge Tilley says the initial attempt to stop Mr. Alston was certainly a traffic stop on page 259 of the appendix. Yes, sir. There's no doubt about it that that's the finding that Judge Tilley made. The mechanics of the traffic stop, to get back to that, in your average traffic stop, a law enforcement officer positions his vehicle behind the suspect vehicle. But here where Captain Alleyne parked alongside Mr. Alston, it was actually less restrictive on the defendant's freedom of movement. In an average traffic stop, there's no vehicle in front of the suspect vehicle here because the appellant ran into the car in front of him. He can't go forward. And if Captain Alleyne had parked his car behind him, then the defendant wouldn't have been able to back up. There was actually more freedom of movement for the appellant here than there would have been had Captain Alleyne parked behind him. In addition, the mere fact that Captain Alleyne parked alongside the vehicle and either made it difficult or impossible for the appellant to get out of the vehicle didn't have any practical impact on the issue of whether or not Mr. Alston was in custody for the purposes of Miranda. And that's because, I'm sure this court has seen cases, what happens in an average routine traffic stop if, without instructions by the officer, the motorist gets out of the car? The officer immediately says, do not get out of your car. Get back into your car. Stay in your car unless and until I tell you to get out of your car. So the mere fact that Captain Alleyne parked his car alongside rather than behind Mr. Alston didn't change the custody situation in this interaction between the two men. Beyond the mechanics, there's been a lot made by the appellant of the testimony at the suppression hearing with respect to this term, psychological advantage. But we have to remember, whatever Captain Alleyne's intention was or what his thought process was during this interaction, the focus here as to whether or not the defendant was in custody for the purposes of Miranda is what the defendant was thinking, how whether he thought his situation was different from what the average reasonable motorist would have been. And here, when we look at the facts, there's simply no evidence whatsoever to call into question Judge Tilley's determination. First, the conversation that took place at the outset of this traffic stop, who initiated it? It was Mr. Alston. It wasn't Captain Alleyne. So if the question is whether or not, through the act of parking his vehicle alongside Mr. Alston's vehicle, the law enforcement officer had somehow overborne Mr. Alston's will, that's simply not reflected when Mr. Alston was the individual who initiated the conversation with the law enforcement officer and not vice versa. Beyond that, take into account the subject matter that the two men discussed. At the outset of that interaction, the discussion was basically small talk. I wasn't paying attention. That's why I ran through the red light. I don't remember exactly. It was something about he had a pregnant girlfriend and he was going to pick up her children or he was late to pick up her children. It didn't have anything to do with are you engaged in criminal conduct? Do you have controlled substances in your vehicle? Do you have firearms in your vehicle? It was casual conversation. And beyond that, that casual conversation, as it's already been discussed this morning, included the appellant lying to Captain Alleyne about what he was doing when he was reaching into the passenger area of the vehicle. I raised that issue simply because if the question is, as it should be, whether or not Captain Alleyne's action had overborne the will of Mr. Alston so that his act of raising up the baggie of marijuana and saying, all I got is this bag of weed, the fact that Mr. Alston still had his faculties about him to the extent that he was able to lie to the officer in an attempt to dissuade him from whatever suspicion Captain Alleyne might have had is yet another indicator that the act of parking the car alongside Mr. Alston did not transform what otherwise would have been considered routine traffic stop into custodial detention requiring Miranda. But there are additional facts that support Judge Tilley's determination, and that has to do with the manner in which the two interacted compared to an average traffic stop. In an average traffic stop, the law enforcement officer gets out of his vehicle and he walks up to the suspect vehicle. He stands right outside the driver's side door of that vehicle in extremely close proximity to the driver of the vehicle, so close that he can touch the driver in uniform, usually with a firearm visible. That's where the conversation takes place. Here, the facts and circumstances of the interaction between Mr. Alston and Captain Alleyne were much less coercive. Remember, the two men are in two different vehicles. They are separated by several feet as opposed to Captain Alleyne being right outside the driver's side door of Mr. Alston. Counsel, I thought the issue with respect to coercion or the involuntariness of the statement by Alston regarding the gun that Judge Tilley was concerned about were the repeated promises that he would not be arrested. Why don't you talk about that? That was a concern, Your Honor, but maybe the easiest way to explain it is that was a bifurcated finding. Judge Tilley made that finding with respect to the issue of the later statement about the firearm in the car. Isn't the firearm what we're concerned about here? Well, ultimately, that's part of our concern here. That's what we're suppressed. I mean, the seizure of the firearm is what the issue is. Yes, sir, and I'm not disagreeing with that. You didn't cross-appeal on what he suppressed. No, sir. No, sir. I agree with that. But Judge Tilley made that finding because by the time we get to the statement about the firearm being in the car, the admission by the appellant, that's way later in the interaction. There are several more minutes that have transpired, and by that time, Captain Aleem has repeated on numerous occasions his intention, which from the record was completely truthful. I'm not going to take you to jail. It's not my intention to take you to jail. I'm not going to arrest you. So much further into the traffic stop, Your Honor, you're correct, Judge Tilley said, by that point, this promise, guarantee, or intent had been repeated so many times, I'm going to find that it overcame Mr. Alston's will to resist. Right, so you're stuck with that, right? Yes, sir. Okay, so what's the result of that? It doesn't have any impact on the earlier interaction between the two on the issue of whether or not there was probable cause to search the vehicle because that comment, the holding up the baggie of marijuana and saying all I got is this bag of weed, that happened almost instantly in the interaction between the two men before Captain Aleem said anything about I'm not going to take you to jail, I don't want to arrest you, it's not my intention to arrest you. Is that what gave him probable cause? Yes, Your Honor. Him saying I got the weed? And producing the bag of marijuana, yes, sir. And throwing the weed in the window? Yes, sir. What about the fact that he was bending over, distracted, trying to do something down under the seat that didn't have anything to do with it? I hesitate to say it didn't have anything to do with it. It was a factor that Captain Aleem could have used in forming reasonable suspicion, but that sort of largely became irrelevant at the point in time, early when Mr. Olson held up the bag of marijuana. But the weed gave him probable cause to search the vehicle? Yes, Your Honor. But the argument from the other side, as I understand it, is that notwithstanding all of that, this particular officer just was not interested in searching the car. All he wanted was for this defendant to be honest with him and voluntarily tell him whether or not there was a weapon in the car. As I understand it, I guess their argument is but for the statement by the defendant that there never would have been a search. I understand that's their argument, Your Honor. There's just no reasonable interpretation of the record before this court to reach that conclusion. Captain Aleem repeatedly, it's clear from the beginning after he observed how Mr. Olson kept looking back and the reaching into the passenger area, that Captain Aleem was convinced that there was at a minimum additional contraband in the vehicle and B, a strong suspicion that there was a firearm in the vehicle. And he kept pressing on that throughout the entirety of his interaction with the appellant. So even after Mr. Olson produced the first small baggie of marijuana, Captain Aleem wasn't satisfied with that and said words to the effect of, okay, well, that's great, but you were reaching way further over than that. There must be something else in your vehicle. Then Mr. Olson revealed that… But Judge Tilley said he was reaching for something or to hide something. That was the finding. Yes, sir. I don't have any dispute with that. Right. He was suspicious of what was down there under the seat or wherever it was. Absolutely. He was reaching as if he wanted to hide something. Absolutely, Your Honor. So Captain Aleem persists even after the initial baggie of marijuana is produced. Eventually that leads to the appellant admitting that there is yet another larger bag containing contraband items in the vehicle. And even after that discovery, Captain Aleem doesn't give up. He still continues to press on and say, okay, now I need to get, I think you referred to it as a heater. I need to get the heater up. I'm pretty sure there's a firearm in the car. He called it a heater. He called it a heater, yes, Your Honor. And that's lingo for a firearm. Yes, sir. Apparently none of my law clerks knew what that was. That is good. Good sign. There are numerous different slang terms for firearms, Your Honor. That's a street term for a firearm. It is, Your Honor. It's a heater. A heater. Yes, sir. And they understood, both of them. Both Captain Aleem and Mr. Olson. Yes. Apparently so because soon after using that phrase. That's what I'm saying. The judge, the officer thought he was trying to hide a firearm. And earlier you said you didn't think that was right. That's the way I understood you. I'm sorry if I answered. I thought that was the first thing I thought. The officer believed this guy was trying to hide a firearm. But from reading what Judge Tilley said. Yes, sir. I'm sorry, Your Honor. I must have misunderstood your question. He was following along. He thought there was a firearm in there. And he wanted to get the guy to turn it over to him. Correct. He called it a heater. Yes, Your Honor. Going all the way back to the fact, if I recall the testimony. He wasn't going to let him leave until he got the firearm. I'm so sure. I don't think, from what I've read in these criminal cases, no officer is going to let that guy drive away from there and go home with a firearm under his seat. Likely not, Your Honor. But I don't think the record. Particularly after giving him a bag of weed. Yes, Your Honor. And he ran into a parked car. He was so nervous. Yes, sir. And going all the way back to the beginning, I think one of the. . . And when you said likely, I guess you say because that. . . The officer was never asked that question, right? I'm sorry. About what he would have done. What he would have done. Was. . . With his family. Yeah. Captain Aleem. If I understand the court's question, I don't believe Captain Aleem was ever asked directly. The question was, no matter what, would you have searched the vehicle? Yeah. What about the fact that it was a statement that led him directly to the firearm? Did he actually conduct a search of the entire vehicle? Or once he found the firearm, that was it? He did not conduct a search of the entire vehicle. Some other officers came, though, at that point, right? They did, Your Honor. The FBI came. So anybody, I guess, even if he wouldn't have conducted the search, maybe we could infer that the others would have. The FBI task force did arrive at the tail end of this interaction and took custody of the defendant. But again. . . Did it take custody of the car? I believe the vehicle was released to his mother, Your Honor. So there wasn't going to be any. . . You know how you always tell us there's always going to be inevitable discovery. There's a search. Ultimately, what do you call it, a search. . . An inventory search, Your Honor. An inventory search. There's no inventory search. This is why. . . I don't know why the district court flagged twice for you inevitable discovery. You agree with me that it's not just that you could have, that they had the right, government had the right to make the search, but also that it would have. And that's why Judge Diaz's questions were worthwhile because all along he's talking about, give me the gun, I'm not going to arrest you. Give me the gun, I'm not going to arrest you. And in fact, they don't take the car. We don't have any evidence that anybody ever searched the car or was going to say to him, I'm going to search this car if you don't give it to me. So how would they have gotten it if it hadn't been for the assurances that I'm not going to arrest you? Because the record is clear, that's what I was attempting to get to, that Captain Aleem was not going to terminate this encounter until he discovered the firearm or until he searched the entire vehicle to determine whether or not. . . He was going to get the firearm. Yes, sir. Period. Does he ever say he's going to search the vehicle if you don't give me the firearm? No, Your Honor, he never. . . So inevitable discovery is, assuming that he hadn't given the firearm up, would the officer have done something? That's the only way it works. It was inevitable that they would discover it. That is the basis upon which the district court let the firearm in, right? I'm not disputing any of that, the legal basis for inevitable discovery. No, no, no, no. That's the basis. Now I'm asking you, what was the basis for letting the firearm in? Do you want me to read to you what the district court said? Or do you agree with me? The firearm may be admitted into evidence. The bag may be admitted. They would have been inevitably been found because there was probable cause to search under the Brookings case. Okay, fine. They had the ability. They had the right to do it. You need the second element. Would they have done it? Could they have done it? Would they have done it? And what I'm arguing is that it's clear that they would have done it. Well, that's the evidence I would like to hear. And it can't be they would have done it because they got it voluntarily. That's not what . . . You have to presuppose that they hadn't gotten it voluntarily, okay? Now, would they? What evidence is that they would have exercised their rights under the inevitable discovery document? The evidence that Captain Aleem would have discovered that firearm is what I was discussing earlier, which is that he was going through this methodically. When the first baggie was produced, he said, that's not good enough, I'm pretty sure there's a firearm in there. And all the time he's saying, I'm not going to arrest you. If you have a gun, you're going to be arrested. Go ahead. But the arrest, whether . . . But I'm asking for the evidence that he would have discovered it if the guy hadn't given it up voluntarily. It's clear in the record that Captain Aleem was not going to relent unless and until he either found the firearm, which he was convinced was in the vehicle. That's clear from his statements. He found the first bag of marijuana. Okay, I know there's still something else in the car. What else is in there? All right, I've got a second bag of marijuana paraphernalia. That's not everything that's in the car either. That's what Captain Aleem said. Where's the heater? It's clear that unless he . . . until he found the firearm or he searched the entirety of the vehicle . . . There's no talk about search. He doesn't say to him, unless you give up the heater, I'm going to have to search the car. That's absolutely true. There's no statement. So we don't have direct evidence. We have all of their dialogue. But part of their dialogue is the Captain keeps assuring him that he's not going to jail. I don't dispute that, but the statements . . . That, it seems to me, counters your suggestion that it was clear that the officer was not going without the gun. I'm not so sure that's clear. No, Your Honor, what I'm arguing is that those two things are not. They're clearly not mutually exclusive. The fact that Captain Aleem didn't intend to arrest Mr. Alston, at the same time Captain Aleem fully intended to either search the vehicle or find the firearm before the search is equally . . . I thought he didn't say that. No. I'm sorry, what, Your Honor? Captain Aleem didn't say what you just said. He did not. And he never made a search after he got the gun. I mean, if you have one gun, you may have many guns. If you have some pieces of drugs, you may have a whole lot hidden in the trunk. He never did that, which indicates that he wouldn't have done it. He wouldn't have made a search. I disagree, Your Honor. It indicates that he found the firearm that he suspected was in the vehicle, which explained why Mr. Alston had been reaching to the passenger side of the vehicle, and that is where, in fact, that firearm was discovered. Part of this interaction, as I recall, was his testimony about that he wasn't so much focused on arresting people because, you know, that was not part of his sort of protocol. He fancied himself as a community resource officer, I guess, but he was intently focused on getting weapons off the street. So why could we take that as some evidence that one way or another he was going to get to the bottom of this and find that weapon? I see my time has expired. Can I answer the question? Yes. Unless I misunderstand, I think that's the point that I've been trying to articulate. Are we entitled to make that finding for you? Which finding, Your Honor? The one you just said, that he wasn't going to let the vehicle leave until he got the firearm. Because he had probable cause. He would have searched it if the guy hadn't turned it over. That's what you're arguing. He would have gotten the firearm one way or another. He wasn't going to let the vehicle leave. Yes, Your Honor. That's correct. And you want us to make that finding for you. I want you to make that finding because it's based upon the facts. Is that a conclusion that inevitably jumps off the page here? I'm asking the court to make that, to affirm Judge Tilley's decision that the facts make it clear that based upon what Captain Alleyne did and what he said, he was not going to terminate that encounter until he found the firearm or until he searched the entirety of the vehicle to confirm that there was Or until it was turned over to him. Until? Until the firearm was turned over to him. The heater. Yes, sir. He wasn't going to let him leave until he gave him the heater. Or search the car and determine that there was no heater inside the vehicle. He didn't search the car. He just turned the heater over to him. Yes, Your Honor. I guess it's a chicken and egg. And any ordinary police officer, if he finds one gun, he's looking for the other guns, right? I mean, that's not the answer. I mean. Mr. Olson was only reaching into one part of the vehicle. Well, there's the trunk. I fully recognize. He can't reach into the trunk, can he? No, Your Honor. So it would make sense then if I followed your. To this day, we don't know if there were other guns in the car, do we? We do not, Your Honor. Thank you. I think this is a crazy case. Now we'll get some clarification. To just follow up on the search issue of the vehicle, what is interesting is some of the timelines that can be verified by what was going on with dispatch. We know that Captain Aleem pulled the vehicle. The initial interaction happens. Almost immediately, the marijuana goes into the vehicle. There is some. I don't understand how you think this helps you. Because. You're talking about prolonging the search, right? Is that the argument you're making? No, I was going to make it how long it took for him to. We know that all of that occurred within eight minutes and 30 seconds of the stop. All right, so your argument goes to that there was an improper prolonging of the search, right? Well, that he was not going to search it. Yes, I do agree with that, and that is something. And I don't mean to. No, I just wasn't sure where your argument was going. I was trying to help you along. Yes, I do believe that it was improperly continued. But I'm trying to say that he had twice as long to search that vehicle, and he did not. Captain Leem didn't find the firearm and call it in until 17 minutes and 28 seconds after the initial stop began. And so that would. But the fellow gave him the firearm. I know he gave him the firearm. At that point, he gave him the firearm, and that was after. He gave him the heater. It's a big nine millimeter with an extended magazine. It's a heavy weapon, a terrible weapon. I don't dispute that. And he was a convicted felon. That's basically what it means. Maybe they're trying to apply the clearly guilty rule on you. Apparently. I don't disagree with that. But I'm just trying to point out how long this stop was prolonged and how long it was before it happened. And I'm happy to answer any other questions the court would have about any of the issues raised. If a party does not make an inevitable discovery doctrine argument proper, inevitable discovery argument, is it waived? I would submit not. What I did argue was under U.S. v. Graham. I'm sorry. Why isn't it waived? I would submit that the way it was argued, which I admitted at the beginning was not as articulate as it should have been, was I argued under United States v. Graham, which is a Fourth Circuit unpublished opinion. And in that, even agreeing that the officer had probable cause to search for the drugs, it was very clear that the only reason he went into that vehicle was for the firearm. And that was based on a suppressed statement exclusively. And under that case, this court had held that any base of probable cause does not cure a warrantless search and seizure. Like in Graham, the officer doesn't go into the vehicle until Mr. Graham says there's a firearm in my vehicle, and that the officer says, well, then he goes into the vehicle and just pulls out that firearm. And he did not, and that the court held in that particular case that there was a reason why the statement was suppressed and not appropriate. But in that case, the court held that going in for that firearm, even though the officer had otherwise had a legitimate reason to go into the vehicle, was that any basis of probable cause does not cure a warrantless search for another reason when the officer clearly states that the only reason he went in was for a firearm, not for the real reason he had probable cause to search the vehicle. Did I articulately say that? Would you like me to clarify that? No, I don't think so. Thank you. Do you have any more questions? No, we have no more questions. We're happy to come down and greet the lawyers, and then we'll go directly to our next case.
judges: Diana Gribbon Motz, Robert B. King, Albert Diaz